UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

|  |  |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br><br>          **Plaintiff,**<br><br>     **v.**<br><br>**TAMARA STEELE, and**<br>**STEELE FINANCIAL, INC.,**<br><br>          **Defendants.** | **Civil Action No. 1:18-cv-2838**<br><br><br><br>**Jury Trial Demanded** |

## COMPLAINT

Plaintiff Securities and Exchange Commission ("the Commission") alleges the following against Defendants Tamara Steele ("Steele") and her solely owned corporation, Steele Financial, Inc. ("Steele Financial"):

## NATURE OF THE ACTION

1.      From approximately December 2012 through October 2016, Steele and Steele Financial, both Indiana-based investment advisers, fraudulently recommended and sold to their advisory clients over $13 million in extremely risky securities issued by a private company, Behavioral Recognition Systems, Inc. ("BRS").  In violation of the Defendants' fiduciary duties of loyalty and good faith, they failed to disclose to their clients that BRS had agreed to pay the Defendants commissions ranging from 8% to 18% of the funds raised for BRS.  By this fraud, Defendants profited at the expense of their clients.

2.      In addition to defrauding their clients, Steele and Steele Financial also acted as brokers for BRS securities without registering with the Commission.  As a result, the Defendants

illegally received hundreds of thousands of dollars in commissions for investments they solicited in BRS from both clients and non-clients.

3.     During the course of the Defendants' scheme, they sold approximately $15 million in BRS and BRS-related securities to approximately 165 individuals, including $13 million to 127 of their advisory clients.  Many of Steele's clients were unaccredited retail investors, including current and former teachers and public school employees.  BRS paid Steele and Steele Financial commissions in the form of cash and warrants to purchase BRS common stock, including approximately $679,000 in cash and 758,000 warrants, which at the time were worth up to $1.9 million.

4.     As part of their fraudulent scheme, Steele and Steele Financial concealed their sales efforts on behalf of BRS from their own clients and from the broker-dealer with which Steele was affiliated at the time.  Specifically, Steele (a) submitted false documents – including letters, invoices, and consulting agreements – to BRS claiming that her husband had provided the services, instead of her; (b) falsely attested to the broker-dealer that she had not engaged in any securities transactions "away from the firm"; and (c) secretly purchased BRS securities from a client using a nominee entity.

5.     By engaging in the conduct alleged in this Complaint, Steele and Steele Financial violated and, unless restrained and enjoined, will again violate Sections 206(1), (2), and (3) of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. § 80b-6(1)-(3)]; Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)]; and Sections 10(b) and 15(a) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78j(b), 78o(a)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## JURISDICTION AND VENUE

6.     The Commission brings this action pursuant to authority conferred by Section

209(d) of the Advisers Act [15 U.S.C. § 80b-9(d)], Section 20(b) of the Securities Act [15 U.S.C.

§ 77t(b)], and Section 21(d)(1) of the Exchange Act [15 U.S.C. § 78u(d)(1)] seeking permanent

injunctions and disgorgement, along with interest, against Defendants.  The Commission seeks

civil penalties pursuant to Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)],

Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], and Section 21(d)(3) of the Exchange

Act [15 U.S.C. § 78u(d)(3)].

7.     The Court has jurisdiction over this action pursuant to Sections 209 and 214 of the

Advisers Act [15 U.S.C. §§ 80b-9, 80b-14], Sections 20 and 22 of the Securities Act [15 U.S.C.

§§ 77t, 77v], and Sections 21 and 27 of the Exchange Act [15 U.S.C. §§ 78u, 78aa].

8.     Venue is proper in this district because, at all times relevant to this Complaint,

Defendants operated as investment advisers and served advisory clients within this district.

During the entire period, Steele Financial was also an Indiana corporation registered as an

investment adviser with the State of Indiana, and its principal place of business was in Pendleton,

Indiana.  At all relevant times, Steele was a resident of Indianapolis, Indiana and was the sole

owner of Steele Financial.  Furthermore, certain of the acts, transactions, practices, and courses

of business that form the basis for the violations alleged in this Complaint occurred in this

district.

9.     In connection with the conduct described in this Complaint, Defendants directly

or indirectly made use of the mails or the means or instruments of transportation or

communication in interstate commerce.

10.     Defendants' conduct involved fraud, deceit, or deliberate or reckless disregard of regulatory requirements, and resulted in substantial loss, or significant risk of substantial loss, to other persons.

## DEFENDANTS

11.     **Steele**, age 49, is the sole owner of Steele Financial and serves as its Chief Compliance Officer (CCO), Chief Financial Officer (CFO), Chief Operating Officer (COO), and Director.  At all relevant times, Steele was an "investment adviser" within the meaning of Section 202(a)(11) of the Advisers Act [15 U.S.C. § 80b-2(a)(11)] because she was in the business of providing investment advice to clients about securities in exchange for compensation, and she also owned, managed, and controlled Steele Financial.  Steele holds Series 6, 63, and 65 licenses.  She was also associated as a registered representative with a broker-dealer from January 2009 until June 2017, when she was terminated after the broker-dealer learned that Steele was selling BRS securities outside the scope of her employment with the firm and without the firm's knowledge and approval, a practice called "selling away" from the firm.

12.     **Steele Financial** is an Indiana corporation formed in 2001 with its principal place of business in Pendleton, Indiana.  Steele is the company's sole owner.  At all relevant times, Steele Financial was also an "investment adviser" within the meaning of Section 202(a)(11) of the Advisers Act [15 U.S.C. § 80b-2(a)(11)].  Steele Financial is registered with the State of Indiana as an investment adviser and manages approximately $60 million for approximately 450 advisory clients.

## RELATED ENTITIES

13.     **BRS**, known as Giant Gray, Inc. since March 2016, is a Texas corporation with its principal place of business in Houston, Texas.  BRS was founded in 2005 and sold video analytic

software that allowed linked video cameras or other systems to recognize certain abnormal or suspicious events.  On December 14, 2017, the Commission filed a complaint in the United States District Court for the Southern District of Texas alleging securities fraud violations against BRS and its former CEO, Ray Davis ("Davis").  Davis is now deceased.  As alleged in the Commission's complaint, BRS and Davis engaged in a fraudulent scheme to raise approximately $28 million from investors through material misrepresentations and directed over $7.8 million of these ill-gotten gains to Davis for his personal benefit.

### STATEMENT OF FACTS

**A.   Background**

14.    Before becoming an investment adviser and forming Steele Financial, Steele taught middle school math at a public school in Indiana.  Steele left teaching in 1999 to become an investment adviser and drew upon her teaching colleagues to acquire advisory clients.  Approximately 33-50% of Steele's clients are current or former teachers or other workers in public education.  Steele described most of her approximately 450 clients as follows:  "two-pensions, two Social Security families, either ten years before retirement, or during retirement, or ten years after retirement that have money that they use sparingly."  Generally, Steele's clients were not sophisticated investors and did not often invest directly in individual stocks.

**B.   Steele Personally Invested in BRS**

15.    Sometime prior to March 2011, Steele learned about BRS from a client who asked to withdraw funds from his individual retirement account and invest in BRS.  Subsequently, in March 2011, Steele personally invested in BRS through a private placement of securities, purchasing 40,000 shares of BRS common stock for $120,000.  Steele did not analyze BRS's financial performance before her first investment, had no prior experience with private placements, and had never heard of the terms "private placement memorandum" or "PPM."

16.     Over the next several years, Steele personally invested over $3 million in BRS securities, both directly through common stock, warrants, and bridge/promissory notes, as well as indirectly through a BRS-related investment vehicle (hereinafter "Fund A").  By October 2014, Steele was one of BRS's largest shareholders.

**C.      Defendants Recommended and Sold BRS Securities to Advisory Clients in Exchange for Commissions Without Disclosing Defendants' Conflicts of Interest or Registering as Brokers**

17.     After Steele invested in BRS, she recommended and sold BRS securities to her advisory clients and other retail investors in exchange for commissions, even though neither she nor Steele Financial was registered as a broker.

18.     During annual reviews with clients, Steele recommended BRS if the client wanted "to be a little bit more aggressive."  Before recommending that her clients invest in BRS, however, Steele did not (a) review BRS's financial information or conduct any other analyses of BRS securities; or (b) suggest any aggressive investments other than BRS.

19.     Steele Financial had written advisory agreements with each client, which Steele signed on behalf of Steele Financial.  The agreements memorialized the fiduciary nature of the advisory relationship and described Steele Financial's compensation for providing advisory services.  Steele Financial's advisory agreements explained that the firm charged a certain percentage of the assets under management each year on a quarterly basis; the highest fee was 1.5% for managed assets up to $500,000, with declining fees for assets in excess of that amount.

20.     As investment advisers, Defendants filed Forms ADV, which is a uniform form used to register with the Commission or, in some instances, a state securities regulator.  A Form ADV contains a variety of disclosures about the adviser and its advisory business.  Steele Financial's Forms ADV filed with the Commission, and posted publicly on Steele Financial's website, described Steele Financial's fees in the same way as the client advisory agreements.

21.     The Defendants' advisory agreements and Forms ADV have never disclosed the compensation arrangement between BRS and Defendants, including at no time between December 2012 and October 2016.  Defendants also did not fully and fairly disclose the compensation arrangement to their clients by any other means.  As investments advisers who owed fiduciary duties to their clients, Defendants had a duty to disclose this conflict of interest when recommending BRS and BRS-related securities to their advisory clients.

22.     Defendants promoted and facilitated private placements of BRS securities by providing potential investors with subscription agreements and securities offering memoranda, including PPMs.  Although the offering documents indicated that only accredited investors, meaning those who meet certain minimum income or net worth requirements, could purchase the securities, Steele nevertheless recommended the BRS investments to many of her clients whom she knew were unaccredited.

23.     Before December 2012, Steele recommended and sold BRS securities to approximately nine of her friends and family members.  Beginning in December 2012, BRS agreed to pay Steele an 8% commission for selling its securities.  Steele elected to receive these payments in the form of warrants to purchase BRS stock.  Incentivized by these commissions, Steele significantly increased her BRS selling activity.  She recommended and sold approximately $7.2 million in BRS securities between December 2012 and May 2014.

24.     During this time, Steele concealed her relationship with BRS from the registered broker-dealer with which she was associated.  In fact, on December 16, 2013, Steele signed and submitted a deceptive annual attestation to her broker-dealer certifying that she had not (a) engaged in any private securities transactions away from the firm, (b) raised money for any other businesses, (c) sold restricted securities, or (d) used any email addresses other than her

business email to communicate with clients.  However, this attestation was deceptive because Steele had engaged in each of these activities since at least December 2012.

25.     In May 2014, Steele engaged in additional deceptive conduct by submitting a false invoice to BRS seeking payment of commissions for her sales efforts.  She submitted one invoice in her own name and another in her husband's name, supposedly for services he performed.  In fact, Steele knew that her husband had performed no such services for BRS.

26.     No later than June 2014, BRS increased Steele's commission rate to 18%, consisting of 8% in cash and 10% in warrants to purchase BRS stock.  Although BRS's offering documents generally disclosed that BRS had agreed to pay broker-dealers and other authorized third parties up to 8% of the offering price as a sales commission, the offering documents never disclosed that Steele or Steele Financial, neither of whom was registered as a broker, would receive any commissions.  Furthermore, the offering documents never disclosed commission rates up to 18% for the Defendants or anyone else.

27.     Steele's efforts to deceive her broker-dealer by concealing her BRS activities were not limited to the false attestations.  On June 11, 2014, Steele emailed a BRS vice president in the sales organization and suggested that he try to sell BRS software to her broker-dealer. Steele again sought to prevent her broker-dealer from learning about her BRS activities, writing, "You can most certainly mention my name:  however, please do not mention that I am a [BRS] shareholder."

28.     By October 2014, Steele's total commissions from BRS comprised cash credits of approximately $679,000 and 758,000 warrants issued in her husband's name based on the false documents Steele submitted to the company.  At the time, these warrants were worth up to $1.9 million.

29.     Although Steele did not take possession of the cash she earned selling BRS securities, she controlled it, could have demanded that BRS pay it to her directly, and instead chose to spend it exercising BRS warrants.  In fact, during October 2014, Steele used the $679,000 in cash commissions to exercise a total of approximately 1.3 million warrants (including the 758,000 warrants that Steele received as commission for selling BRS securities) at a price of $0.50 per warrant.  Through the exercise, BRS issued Steele approximately 1.3 million shares of BRS common stock, again in her husband's name.  At that time, the price of BRS common stock was $3 per share.

30.     On December 4, 2014, Steele again signed and submitted to her broker-dealer a deceptive annual attestation stating that she would obtain written approval before she participated in any private securities transactions outside of her relationship with the broker-dealer.  She also agreed to notify the firm if she would receive any compensation in connection with such transactions.  Yet, at the time Steele had already sold BRS securities and received compensation for approximately two years.  She also continued to sell BRS securities in private transactions for another approximately two years without ever disclosing the transactions.  In June 2017, after Steele learned of the Commission's investigation, she disclosed her BRS activities to her broker-dealer and was terminated soon afterward.

31.     By mid-2015, Steele knew that BRS was in dire financial condition.  In the fall of that year, BRS missed interest payments on its promissory notes, whose holders included many of Steele's clients.  On October 22, 2015, Steele, putting the interests of BRS ahead of her clients' interests, identified for BRS which of her clients could be "persuaded" to accept delayed interest payments and those that would be "very upset" if they did not receive their money.  She

engaged in this effort to assist BRS and provided information that disadvantaged certain of her own clients.

32.     From October 2014 through at least October 2016, Steele continued to sell BRS securities and sought commission payments pursuant to the 18% commission arrangement described above.  For example, in February 2016, Steele emailed BRS seeking payment for her efforts selling BRS securities.  In doing so, Steele attached a letter requesting payment for purported consulting services performed by her husband between 2014 and 2016.  Steele knew, however, that her husband never performed any consulting services for BRS.

33.     Moreover, in or around March 2016, Steele solicited additional investments in BRS through Fund A, a vehicle created to purchase a controlling block of BRS securities from BRS's then-CEO, Davis, and infuse working capital in the company.

34.     Notwithstanding Steele's duty to place her clients' interests above her own, Steele used Fund A and her clients' funds to engage in a last-ditch effort to save BRS, which also protected her personal financial stake in the company.

35.     Between March and October 2016, based on Steele's recommendations, approximately 50 individuals invested approximately $2 million in BRS through Fund A.  Almost 40 of these investors were Defendants' advisory clients who invested approximately $1.6 million in the fund.  Many of these investors had previously invested directly in BRS securities.

36.     In June 2016, Steele sent another email and attached a letter requesting payment from BRS for purported consulting services performed by her husband.  Once again, Steele knew that her husband had never performed any consulting services for BRS.  That same month, Steele also sent BRS two fake consulting agreements, signed by both her husband and a BRS executive,

falsely representing that her husband was owed compensation for services her husband purportedly provided to BRS.  Steele's requests for payment to her husband were, in fact, her attempts to seek disguised commission payments for her own efforts selling BRS securities.

37.     As with her efforts selling direct investments in BRS, Steele understood she would be paid for her efforts selling investments in Fund A.  In September 2016, she sent an email to an individual at Fund A requesting commission payments and attached a schedule listing the approximately $2 million in investments that Steele had solicited for the fund.

38.     In October 2016, Steele sent another email to a person at Fund A seeking compensation for selling BRS securities.  In particular, she sought 2.3 million warrants, which would have entitled her to purchase shares of BRS common stock for $0.001 per share.  As she did in February and June 2016, Steele again submitted a document – another consulting agreement – falsely claiming that her husband had performed services for BRS, when she knew he had never provided any such services.

39.     Steele, by the fraudulent conduct described in this Complaint, disregarded the fiduciary duties she owed to her clients and acted as a sales person who put her own pecuniary interests first.  She did so without disclosing her conflict of interest to her clients.

**D.     Steele Concealed Her Involvement in a Principal Transaction with a Client When She Was Required to Disclose Her Involvement in Writing and Obtain Client Consent**

40.     In or about May 2016, one of Defendants' advisory clients, a husband and wife with a joint account, complained to Steele about the client's investment in BRS securities and requested that Steele arrange for the investment to be repurchased.  Specifically, the client complained in an email to Steele that she had not shared information about the financial health of BRS, had misled the client about when investment payments would be made, and was involved in a "scheme to defraud investors of their money."

41.     The client explained that if the matter were not resolved the client would file complaints with state and federal law enforcement authorities responsible for investigating financial fraud.  Steele forwarded excerpts of this email to a BRS executive asking him to call her client and return the client's investments.

42.     Ultimately, when BRS failed to purchase the client's BRS securities, Steele arranged to purchase them herself.  To disguise her involvement in the transaction, Steele arranged to purchase her client's BRS securities using a nominee entity owned by a third-party. This transaction was memorialized in a purchase agreement dated July 29, 2016 and was consummated in early August.   At Steele's behest, the nominee entity included in the purchase agreement a confidentiality provision that prohibited the client from making statements with the intent to disparage Steele, Steele Financial, or Steele's broker-dealer.

43.     As investment advisers, Defendants were required, before purchasing any security from a client, to disclose the nature of the transaction in writing and to obtain the client's consent.  In fact, Steele Financial's own Policies and Supervisory Procedures Manual prohibited "Principal Transactions" without written disclosure and client consent.  Rather than comply with these straightforward requirements, Steele arranged to purchase BRS securities from her client without the client's knowledge by using a nominee entity.  She then had a confidentiality provision included in the purchase agreement to prevent others from learning about the transaction.

44.     After arranging to purchase her client's BRS securities, Steele continued to sell investments in BRS through Fund A.  In particular, from August to October 2016, Steele sold approximately $335,000 in Fund A investments to advisory clients and other individuals.

**E.      Defendants Acted as Unregistered Brokers in Violation of the Federal Securities Laws**

45.      Between December 2012 and October 2016, neither Steele nor Steele Financial registered with the Commission as brokers or dealers under the Section 15(b) of the Exchange Act.

46.      Nevertheless, as described above, Defendants sold BRS and BRS-related securities to investors during this entire period. Steele and Steele Financial received transaction-based compensation in return for these services to BRS, specifically, commissions based on a percentage of the investments made by clients and other investors, which was separate from the asset management fees Defendants charged their advisory clients.  In particular, as alleged above, in approximately December 2012, BRS agreed to pay Steele an 8% commission, and beginning no later than June 2014, BRS agreed to increase Steele's commission to 18%.

47.      Defendants' activities on behalf of BRS consisted of more than simply bringing together the parties to the securities transactions described in this Complaint.  Defendants actively solicited and found investors from both their existing client base and elsewhere and received transaction-based compensation in return.

48.      Moreover, Steele sold the BRS securities outside the scope of her employment with her broker-dealer and without the firm's knowledge and approval.  In 2017, after learning of the Commission's investigation, Steele finally reported her BRS selling activities to her broker-dealer.  Steele's broker-dealer terminated her employment in June of that year.

**F.      The Commission's Action Is Timely**

49.      On August 1, 2017, April 6, 2018, and June 29, 2018, Defendants entered into agreements tolling the statute of limitations for, respectively, the periods July 20, 2017 through December 31, 2017; April 1, 2018 through June 30, 2018; and July 1, 2018 through July 30,

2018 as to all claims in, and relief sought through, an enforcement action brought by the Commission arising from its investigation, which includes this action.

## FIRST CLAIM FOR RELIEF

### Fraud by an Investment Adviser
### Violation of Sections 206(1) and (2) of the Advisers Act [15 U.S.C. § 80b-6(1)-(2)]
### (Steele and Steele Financial)

50.     The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 49 above as if set forth fully herein.

51.     By the conduct described above, Steele and Steele Financial, (a) while acting knowingly or recklessly, employed devices, schemes, or artifices to defraud clients and prospective clients; and (b) while acting knowingly, recklessly, or negligently, engaged in transactions, practices, and courses of business which operated as a fraud or deceit upon clients and prospective clients.

52.     Steele and Steele Financial have violated and, unless restrained and enjoined, will again violate Sections 206(1) and (2) of the Advisers Act [15 U.S.C. §80b-6(1)-(2)].

## SECOND CLAIM FOR RELIEF

### Fraud in the Offer or Sale of Securities
### Violation of Section 17(a) of the Securities Act [17 U.S.C. § 77q(a)]
### (Steele and Steele Financial)

53.     The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 49 above as if set forth fully herein.

54.     By the conduct described above, Steele and Steele Financial, in the offer or sale of securities, by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, (1) while acting knowingly or recklessly, employed devices, schemes, and artifices to defraud; (2) while acting knowingly, recklessly, or negligently, obtained money or property by means of untrue statements of material

14

fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (3) while acting knowingly, recklessly, or negligently, engaged in transactions, practices, and a course of business which operated or would have operated as a fraud or deceit upon the purchaser.

55.      Steele Financial and Steele violated and, unless restrained and enjoined, will again violate Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

### THIRD CLAIM FOR RELIEF

**Fraud in Connection with the Purchase or Sale of Securities**
**Violation of Section 10(b) of the Exchange Act and**
**Rule 10b-5 thereunder [15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5]**
**(Steele and Steele Financial)**

56.      The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 49 above as if set forth fully herein.

57.      By the conduct described above, while acting knowingly or recklessly, Steele and Steele Financial, in connection with the purchase or sale of securities and by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, directly or indirectly, (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, and courses of business which operated or would have operated as a fraud or deceit upon any person.

58.      Steele and Steele Financial violated and, unless restrained and enjoined, will again violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## FOURTH CLAIM FOR RELIEF

**Acting as Undisclosed Principal in a Securities Transaction**
**Violation of Section 206(3) of the Advisers Act [15 U.S.C. § 80b-6(3)]**
**(Steele and Steele Financial)**

59.     The Commission repeats and incorporates by reference the allegations in

paragraphs 1 through 49 above as if set forth fully herein.

60.     By the conduct described above, Steele and Steele Financial, by use of the mails

or any means or instrumentality of interstate commerce, while acting knowingly, recklessly, or

negligently and while acting as principals for their own accounts, purchased securities from a

client, without disclosing to that client in writing before the completion of such transaction the

capacity in which they were acting and without obtaining the consent of the client to such

transaction.

61.     Steele and Steele Financial violated and, unless restrained and enjoined, will

again violate Section 206(3) of the Advisers Act [15 U.S.C. §80b-6(3)].

## FIFTH CLAIM FOR RELIEF

**Acting as an Unregistered Broker**
**Violation of Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)]**
**(Steele and Steele Financial)**

62.     The Commission repeats and incorporates by reference the allegations in

paragraphs 1 through 49 above as if set forth fully herein.

63.     At all relevant times, Steele and Steele Financial each acted as a "broker" as

defined in Section 3(a)(4) of the Exchange Act [15 U.S.C. § 78c(a)(4)] because they were

engaged in the business of effecting transactions in securities for the account of others and no

exception to the definition applied.

64.     By the conduct described above, Steele and Steele Financial, while acting as

brokers, made use of the mails or any means or instrumentality of interstate commerce to effect

transactions in, or to induce or attempt to induce the purchase or sale of, securities without having been registered with the Commission in accordance with Section 15(b) of the Exchange Act [15 U.S.C. §78o(b)].

65.     Steele and Steele Financial violated, and unless restrained and enjoined, will again violate Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)].

### PRAYER FOR RELIEF

WHEREFORE, the Commission requests that this Court enter Final Judgments:

A.     Finding Defendants liable for the violations alleged herein;

B.     Permanently enjoining and restraining Defendants and each of their agents, servants, employees and attorneys and those persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, including facsimile transmission or overnight delivery service, from directly or indirectly engaging in the conduct described above, or in conduct of similar purport and effect, in violation of Sections 206(1), (2), and (3) of the Advisers Act [15 U.S.C. §80b-6(1)-(3)], Section 17(a) of the Securities Act [15 U.S.C. §§ 77q(a)]; and Sections 10(b) and 15(a) of the Exchange Act [15 U.S.C. §§ 78j(b), 78o(a)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

C.     Requiring Defendants to disgorge their ill-gotten gains, plus pre-judgment interest, with said monies to be distributed in accordance with a plan of distribution to be ordered by the Court;

D.     Requiring Defendants to pay civil penalties pursuant to Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)], Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

E.     Retaining jurisdiction over this action to implement and carry out the terms of all orders and decrees that may be entered; and

F.     Awarding such other and further relief as the Court deems just and proper.

## **JURY DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands trial by jury in this action of all issues so triable.

Dated:  September 14, 2018                    Respectfully submitted,

                                                                 SECURITIES AND EXCHANGE COMMISSION

                                                                 By:      /s/ Gregory Bockin
                                                                          Gregory R. Bockin
                                                                          Kevin C. Lombardi
                                                                          U.S. Securities and Exchange Commission
                                                                          100 F. Street, N.E.
                                                                          Washington, D.C.  20549
                                                                          Tel:  (202) 551-5684 (Bockin)
                                                                          Email: BockinG@sec.gov